IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRUCE TOLL,                          :    CIVIL ACTION
                                     :    NO. 11-7141
          Plaintiff,                 :
                                     :
     v.                              :
                                     :
LEONARD TANNENBAUM,                  :
                                     :
          Defendant.                 :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        November 15, 2013


          Plaintiff Bruce Toll brings this action against his

former son-in-law, Leonard Tannenbaum, for breach of an oral

contract.  Toll alleges that in 2007 he personally guaranteed

$15 million in loans to Tannenbaum in order to keep one of

Tannenbaum's investment management companies afloat.  Am. Compl.

¶ 1, ECF No. 34.  Toll claims that, in exchange, Tannenbaum

orally promised to share equally all of his profits from the

management company with Toll's daughter (and Tannenbaum's wife

at the time), Elizabeth Toll.  Id.  Toll now seeks enforcement

of the alleged oral agreement, or, in the alternative, equitable

relief sounding in quasi-contract.  Id. ¶¶ 53, 55, 62, 69.  He

also claims that Tannenbaum never intended to perform on the

contract, and thus is liable for fraud.  Id. ¶¶ 75-79.

Tannenbaum has moved for summary judgment on all of Toll's claims.  ECF Nos. 59, 60.

Upon consideration of each of Toll's claims, the Court concludes that each can be resolved in Tannenbaum's favor as a matter of law.  First, the Court finds that New York law governs the contract dispute, and thus the breach of contract claim is barred by New York's statute of frauds.  Second, under New York law the quasi-contract claims, although not barred by the statute of frauds, are otherwise impermissible because of the relief sought and because any inequity hinges on the existence of an agreement.  Third, Pennsylvania's statute of limitations bars the fraud claim, as undisputed facts reveal that Toll could easily have discovered the existence of the claim more than two years before filing this lawsuit.  The Court therefore will grant Tannenbaum's motion and will enter judgment in favor of Defendant.

I.    **FACTUAL BACKGROUND**

Toll and Tannenbaum have a long history of doing business together, which began about a year after Tannenbaum married Toll's daughter Elizabeth in 1997.  Pl.'s Resp. 4, ECF No. 65.  Toll agreed to help his new son-in-law start an investment fund ("Fund I") by providing the funds for the venture.  Id.  The two agreed to a 90%-10% share of the profits, with Toll receiving the larger portion.  Id.  Tannenbaum also

2

set up a separate company to manage Fund I, which collected
management fees from the fund that were then paid to Tannenbaum.
Id.  Fund I became very successful, with both Toll and
Tannenbaum making millions of dollars from the venture.  Am.
Compl. ¶¶ 14-18.

In 2004, Tannenbaum approached Toll about investing
$60 million in a second investment fund ("Fund II").  Pl.'s
Resp. 5.  Toll was unwilling to invest $60 million, but agreed
to invest $20 million.  Id.  Toll also personally guaranteed a
$6.7 million loan to Fund II in 2005.  Def.'s Mem. Supp. Mot.
Summ. J. 6, ECF No. 59-1; Kaplan Decl., Ex. 1, Toll Dep. 56:8-
57:21, June 14, 2012, ECF No. 59-3 ("Def. Toll Dep.").  Unlike
with Fund I, Toll did not have a profit share in Fund II.
Def.'s Mem. Supp. Mot. Summ. J. 5; Pl.'s Resp. 5.  Tannenbaum
set up a management company for Fund II, which again collected
management fees from the fund that were paid directly to
Tannenbaum.  Pl.'s Resp. 5-6.

According to Tannenbaum, the parties' personal
relationship deteriorated during that period (id. at 5), and by
2006 Tannenbaum had developed a deep "animosity" toward Toll
(id. at 7).  Nonetheless, Tannenbaum again approached Toll
regarding a third venture that was launched in 2007 (id. at 6),
and which eventually gave rise to this litigation.  The third
venture, called Fifth Street Mezzanine Partners, III, L.P.

3

("Fund III"), was founded on February 15, 2007, as an investment fund organized under the laws of Delaware.  Am. Compl. ¶ 25.  As with his previous ventures, Tannenbaum also established a private management company, Fifth Street Management LLC ("Fifth Street Management"), to advise Fund III and to collect a fee for management services.[1]  Pl.'s Resp. 6-7.  That company was formed on March 8, 2007.  Am. Compl. ¶ 25.  On January 2, 2008, Tannenbaum took Fund III public by merging it with and into Fifth Street Finance Corporation, a public company for which Tannenbaum currently serves as Chief Executive Officer and Chairman of the Board of Directors.  Id. ¶ 24.

Toll was involved in the formation of Fund III and Fifth Street Management in several different ways.  First, he agreed to commit $25 million to finance the venture.  Pl.'s Resp. 6.  He also agreed to guarantee a $50 million line of credit to Fund III, in exchange for a one percent annual fee.

---

[1]     More precisely, Fifth Street Management collects two types of fees from Fund III – a "management fee" and an "incentive fee."  Pl.'s Resp. 6.  The management fee is a fixed percentage of the fund's gross assets, and it is used mostly to cover administrative expenses.  Id., Ex. D, Berman Dep. 149:1-7, 206:18-207:5, July 12, 2012.  The incentive fee is an additional fee that is paid by Fund III to Fifth Street Management if the fund's earnings exceed eight percent per year.  Id. at 150:15-22, 153:3-4.  Most of the incentive fee is then paid to Tannenbaum.  Id. at 153:3-4.  Tannenbaum agreed to waive the incentive fee for 2007 in order to attract investors.  Id. at 189:17-19.

Id. at 11.  That agreement was initially reached orally, but was later reduced to writing.  Id. at 11 n.7; see also Kaplan Decl., Ex. 2, Guaranty Fee Agreement, Oct. 10, 2007.  Toll further provided a short-term "bridge loan" of $15 million to Fund III, charging a 12% interest rate.  Pl.'s Resp. 11.  Finally, Toll guaranteed $15 million in loans to Tannenbaum personally.  Id. at 10; id., Ex. F, Promissory Note, May 14, 2007; id., Ex. G, Promissory Note, May 14, 2007; id., Ex. H, Unconditional Guaranty, May 14, 2007.  It is that $15 million loan guaranty that is the subject of this lawsuit, as the parties hotly contest the circumstances giving rise to it.

According to Toll, negotiations regarding the $15 million loan guaranty began in the latter part of 2006, when Tannenbaum told him that Fund III and Fifth Street Management were in need of a capital infusion and asked him to personally guarantee loans to keep the company afloat.  Am. Compl. ¶¶ 27-28; Pl.'s Resp. 7.  Without Toll's personal guaranty, Tannenbaunm allegedly was unable to obtain a loan of the size necessary to keep Fund III running.  Pl.'s Resp. 7.  Toll claims to have told Tannenbaum that he was unwilling to guarantee the loans without some form of compensation, noting the parties' prior 90%-10% profit-sharing arrangement.  Id. at 7-8. According to Toll, Tannenbaum proposed that they forgo the 90%-10% split, instead offering to share with his then-wife,

5

Elizabeth Toll, half of the profits he earned from Fifth Street Management.  Id. at 8; id., Ex. B, Toll Dep. 89:19-90:6, June 14, 2012 ("Pl. Toll Dep.").  Toll alleges that, after a series of discussions that took place over several months, he and Tannenbaum reached an oral agreement to that effect. Id. at 9. More precisely, Toll claims that in May 2007 he verbally accepted Tannenbaum's offer to share 50% of his earnings from Fifth Street Management with Elizabeth, in exchange for Toll's personal guaranty of $15 million in loans to support Fund III. Pl. Toll Dep. 88:11-89:23, 109:23-20.  That alleged oral agreement was never reduced to writing, and Toll says that he never told anyone about the deal until this lawsuit, including his daughter Elizabeth.  Def. Toll Dep. 115:1-12.

On May 14, 2007, Toll signed an Unconditional Guaranty in which he was the "Guarantor" of $15 million in loans from Wachovia Bank, and Tannenbaum was the "Borrower."  Pl.'s Resp., Ex. H, Unconditional Guaranty, May 14, 2007.  The loan guaranty consisted of two promissory notes, one for $12 million and one for $3 million.  Id., Ex. F, Promissory Note; id., Ex. G, Promissory Note.  Tannenbaum signed these notes and mailed them to Wachovia Bank in Philadelphia.  Id. at 10.  Since then, Tannenbaum has made tens of millions of dollars in profits from Fifth Street Management. Id. at 13-14; Am. Compl. ¶ 38; Answer ¶ 38, ECF No. 35.

In the spring of 2009, the promissory notes for the
Wachovia Bank loans became due, with $12 million still
outstanding.  Pl.'s Resp. 12.  Wachovia asked that Tannenbaum
either pay off the balance, or that Toll sign another personal
guaranty to extend the loan for the remaining $12 million.  Id.
Toll says that he asked to be released from the guaranty, but
that Tannenbuam threatened to default unless Toll signed another
personal guaranty.  Id.  Toll therefore reluctantly agreed to
sign another personal guaranty for the $12 million, allegedly so
as not to jeopardize the previous agreement regarding the
sharing of profits with Elizabeth.  Id.; Am. Compl. ¶ 42.

Shortly after Toll signed the second guaranty on May
26, 2009, Tannenbaum separated from Elizabeth Toll and initiated
divorce proceedings.  Pl.'s Resp. 12.  Toll contends that he
attempted to contact Tannenbaum in the fall of 2009 to remind
him of his obligation to share the profits from Fifth Street
Management with Elizabeth, but Tannenbaum refused to take his
calls.  Am. Compl. ¶¶ 44-45.  Toll also sent emails to
Tannenbaum and to Bernard Berman, the president of Fifth Street
Management, asking to be paid a one percent fee for guaranteeing
the loans; Toll explained that he believed that he was entitled
to the fee because he received such a fee for his guaranty of

the $50 million loan to Fund III.[2]  Pl.'s Resp. 13; Def.'s Mem.
Supp. Mot. Summ. J. 6-7; id., Ex. 5, Email Exchange, Sept. 24,
2009; id., Ex. 6, Email Exchange, Sept. 17, 2009.  Tannenbaum
responded that Toll was "not entitled to any compensation in
this regard."  Id., Ex. 6.

Tannenbaum's divorce with Elizabeth became final on
October 6, 2010 (Am. Comp. ¶ 46), and the two entered into a
marital separation agreement.  Id. at 8; id., Ex. 10, Separation
Agreement.  In the separation agreement, Elizabeth Toll
disclaimed any interest in Fifth Street Management and released
any and all claims against Tannenbaum.  Id., Ex. 10, Separation
Agreement § 7.1(f).

Both parties agree that, although Fifth Street
Management has generated profits, to date Tannenbaum has not

---

[2]      Specifically, Toll sent Tannenbaum an email on
September 17, 2009, stating that:

> Evidently in May of 2009 I co-signed a note
> for Fifth Street Capital.  Why I did this, I
> don't know, because I am not on the board
> and there is no remuneration to me.  I
> assume that because I was paid 1% on the $50
> million dollar [sic] loan a few years ago
> that I was going to continue to get 1% to
> guarantee the loan.  Otherwise, there would
> be no reason for me to co-sign a loan for a
> public company or the private company.

Def.'s Mem. Supp. Mot. Summ. J., Ex. 6.  A second email sent
September 24, 2009, email reads: "[T]he only reason I signed the
original loan three years ago was because I assumed I was going
to get the same 1% that I got as a fee on the previous loan I
guaranteed for your company."  Id., Ex. 5.

shared any of the profits with Elizabeth.  Id. at 2; Pl.'s Resp.
14.  Toll therefore contends that Tannenbaum is in breach of
their oral agreement of May 2007.  Am. Compl. ¶ 1.  Tannenbaum,
on the other hand, says that the alleged oral agreement never
existed, and thus that he is not, and never has been, required
to share the profits from Fifth Street Management with his
former wife.  Def.'s Mem. Supp. Mot. Summ. J. 3.  According to
Tannenbaum, Toll agreed to guarantee the $15 million loans for
no consideration at all, as he did with the previous $6.7
million loan to Fund II.  Id. at 6.

## II.  PROCEDURAL HISTORY

Toll filed suit against Tannenbaum in the Montgomery
County Court of Common Pleas on October 19, 2011, bringing
claims for breach of contract, unjust enrichment, quantum
meruit, promissory estoppel, and fraud.  Notice of Removal, Ex.
A, Compl., ECF No. 1.  Tannenbaum removed the case to the
Eastern District of Pennsylvania on November 15, 2011, on the
basis of diversity jurisdiction.[3]  Id. at 1-3.

On December 12, 2011, Tannenbaum filed a motion to
dismiss.  ECF No. 13.  After holding a hearing, the Court
granted the motion as to the breach of contract claim, holding

---

[3]      Diversity jurisdiction is proper under 28 U.S.C. §
1332 because Plaintiff is a citizen of Florida and Defendant is
a citizen of Connecticut, and the amount in controversy exceeds
$75,000.  Notice of Removal ¶¶ 7, 8.

that compensatory damages under the contract could only be recovered by the intended beneficiary: Elizabeth Toll.  Order of March 14, 2012, at 14 n.5, ECF No. 29.  The Court explained that, because Elizabeth had released all claims against Defendant pursuant to their separation agreement, she could not recover damages under the alleged contract.  Id.  The Court advised Toll that he could, however, bring an action for specific performance of the contract, for nominal damages, or for his actual damages.  Id.  The Court denied the motion to dismiss as to the other counts.

Toll filed an amended complaint on March 22, 2012, which again brought claims for breach of contract, unjust enrichment, quantum meruit, promissory estoppel, and fraud.  For his breach of contract claim, Toll now seeks actual damages in excess of $50,000 for "the loss of the value of the share in Fifth Street Management that he would have received but for his reliance on Tannenbaum's promise, and the loss of the ability to otherwise invest the money subject to the guaranty."  Am. Compl. ¶ 53(1).  In the alternative, he requests specific performance of the agreement – that is, that the Court compel Tannenbaum to pay Elizabeth Toll 50% of the past, present, and future profits of Fifth Street Management and any successor entities.  Id. ¶ 53(2).  For his equitable claims, which he argues in the alternative, Toll seeks restitution in an amount equal to the

10

reasonable value of the interest in Fifth Street Management that he would have had if Tannenbaum had not promised to share profits with Elizabeth. Id. ¶¶ 60, 67, 73, 79. Based on the parties' previous business history, Toll contends that the reasonable value of that interest would be 90% of the profits since May 14, 2007. Id.

On October 17, 2012, Tannenbaum moved for summary judgment. Among other things, he contends that Toll's contract claim is governed by New York law, and that, because it is based on an alleged oral agreement, it is barred by New York's statute of frauds. Def.'s Mem. Supp. Mot. Summ. J. 3. Toll responds that the contract claim is controlled by Pennsylvania law, which would not bar his claim. Pl.'s Resp. 1. There is therefore a threshold choice-of-law question that must be addressed to resolve Tannenbaum's motion.

The Court held two hearings in connection with the choice-of-law question. At the first, the Court heard argument on whether the factual matters underlying the choice-of-law issue should be resolved under the summary judgment standard – viewing the facts in the light most favorable to the non-moving party and reserving any disputes regarding material facts for the jury – or whether they should be resolved by the Court under the preponderance of the evidence standard. For the reasons discussed below, see infra Section IV.A.2, the Court concluded

11

that choice of law is a legal question for the court to resolve, which, however, may require resolution of disputed facts. The Court then held a second hearing, at which the parties presented evidence regarding the factual disputes underlying the choice-of-law issue. That issue, as well as the overall motion for summary judgment, is now ripe for disposition.

## III. LEGAL STANDARD

Summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the

nonmoving party."  Pignataro v. Port Auth. of N.Y. & N.J., 593
F.3d 265, 268 (3d Cir. 2010).  While the moving party bears the
initial burden of showing the absence of a genuine issue of
material fact, meeting this obligation shifts the burden to the
nonmoving party who must "set forth specific facts showing that
there is a genuine issue for trial."  Anderson, 477 U.S. at 250.

## IV.  DISCUSSION

Tannenbaum contends that he is entitled to judgment as
to all Toll's claims.  Specifically, Tannenbaum argues that the
breach of contract and equitable quasi-contract claims are
impermissible under New York's statute of frauds, that the fraud
claim is barred by the two-year statute of limitations, and that
all of Toll's claims should be dismissed because under the
undisputed facts no reasonable jury could find that the alleged
agreement even existed.  Toll, of course, disagrees, saying that
"[t]his case presents a classic 'swearing contest' that cannot
be resolved on a motion for summary judgment."  Pl.'s Resp. 1.
He argues that Pennsylvania law applies to – and permits – the
contract and quasi-contract claims, and that even under New York
law the quasi-contract claims can survive.  Finally, he asserts
that the fraud claim is not barred by the statute of limitations
because of the so-called "discovery rule," which tolls the
limitations period when a plaintiff did not know of the
existence of a claim, and could not have known of it through the

exercise of reasonable diligence.  The Court will address each
of Toll's claims seriatim.

A.  <u>Breach of Contract</u>

As pointed out above, there is a threshold choice-of-
law question that must be resolved in order to resolve Toll's
breach of contract claim – namely, whether Pennsylvania or New
York law governs the dispute.  If New York law applies, as
Tannenbaum contends it does, then New York's statute of frauds
would control the breach of contract claim.  That statute
provides that an oral contract is void if, by its terms, it "is
not to be performed within one year from the making thereof."
N.Y. Gen. Oblig. Law § 5-701(a)(1).  Toll does not contest that
the alleged oral contract between him and Tannenbaum could not
be performed within a year, and thus it would be void under New
York's statute of frauds.  <u>See</u> Pl.'s Resp. 19.  Pennsylvania's
statute of frauds, on the other hand, would not bar such a
contract.  <u>See</u> 33 Pa. Cons. Stat. §§ 1-6 (2011); <u>Inoff v.
Craftex Mills, Inc.</u>, No. 06-3675, 2007 WL 4355385, at *5 (E.D.
Pa. Dec. 11, 2007) ("Pennsylvania's statute of frauds does not
limit enforcement of oral contracts to those that can be
performed within a limited period of time.").  The choice-of-law
determination therefore bears significantly on the parties'
dispute.

1. <u>General Choice-of-Law Rules</u>

14

As the Court explained at the motion to dismiss stage, "[a] federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state," which here is Pennsylvania.  Order of March 14, 2012, at 2 n. 2 (quoting Echols v. Pelullo, 377 F.3d 272, 275 (3d Cir. 2004) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941))).  Pennsylvania courts apply an interests/contacts approach to choice-of-law issues, using a three-step analysis. O'Loughlin v. Hunger, No. 07-1860, 2009 WL 1084198, at * 2 (E.D. Pa. Apr. 21, 2009) ("Pennsylvania adopts a 'flexible rule which permits analysis of the policies and interests underlying the particular issue before the court.'") (quoting Griffith v. United Air Lines, Inc., 203 A.2d 796, 805 (Pa. 1964)).[4]  First, the court must determine whether the states' laws are actually incompatible.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229-230 (3d Cir. 2007).  If they are, the court then examines whether both jurisdictions have a governmental policy or interest that

---

[4]      While the Pennsylvania Supreme Court has not expressly extended the interests/contacts analysis to contract choice-of-law questions, the Pennsylvania Superior Court, federal district courts, and the Third Circuit have applied the Griffith interests/contacts approach to contract choice-of-law questions. See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 227-228 (3d Cir. 2007) (reaffirming the Court's prediction that the Pennsylvania Supreme Court would apply Griffith to contract disputes).  This Court therefore joins the number of courts which have predicted that the Pennsylvania Supreme Court, if faced with the issue, would apply the Griffith interests/contacts approach to contract claims.

would be impaired by the application of the other state's law,
such that a "true conflict" exists.  Id. at 230.  If there is a
"true conflict," the court must proceed to the third step and
"determine which state has the greater interest in the
application of its law."  Id. at 231 (internal quotation marks
omitted).  That determination requires the court to weigh the
contacts each jurisdiction has with the dispute on a qualitative
scale, and to "consider the interests and policies that may
validly be asserted by each jurisdiction."  Pac. Empl'r Ins. Co.
v. Global Reinsurance Corp. of Am., 693 F.3d 417, 438-39 (3d
Cir. 2012) (internal quotation marks omitted).

      Pennsylvania courts, adopting the approach of the
Restatement (Second) of Conflict of Laws, consider the following
contacts relevant to determining the appropriate choice of law
in an action for breach of contract: (1) the place of
contracting; (2) the place of negotiation of the contract; (3)
the place of performance; (4) the location of the subject matter
of the contract; and (5) the domicil, residence, nationality,
place of incorporation, and place of business of the parties.
Gallagher v. Med. Research Consultants, L.L.P., No. 04-236, 2004
WL 2223312, at *6 (E.D. Pa. Oct. 1, 2004); see also Restatement
(Second) of Conflicts of Law § 188(2) (1971).  Courts consider
those contacts in light of the general principles governing

16

choice-of-law analysis. <u>Pac. Empl'r</u>, 693 F.3d at 437-38.  Those

principles are outlined in § 6 of the Restatement, and include:

> a) the needs of the interstate and
>    international systems,
> b) the relevant policies of the forum,
> c) the relevant policies of other interested
>    states and the relevant interests of those
>    states in the determination of the
>    particular issue,
> d) the protection of justified expectations,
> e) the basic policies underlying the
>    particular field of law,
> f) certainty, predictability and uniformity
>    of result, and
> g) ease in the determination and application
>    of the law to be applied.

Restatement (Second) of Conflict of Laws § 6.  Those factors are

also considered in determining which state has the greater

policy interest in having its law applied.  <u>Hammersmith</u>, 480

F.3d at 235.  In light of all these considerations, courts

choose which state's law to apply.

At the motion to dismiss stage, the Court determined

that a conflict exists between New York and Pennsylvania law,

and that the conflict is a "true conflict."[5]  The Court therefore

---

[5]       The Court explained that a conflict exists because
under Pennsylvania law an oral contract of infinite duration
would be enforceable, whereas it would generally not be
enforceable under New York law.  That conflict is a "true
conflict" because each jurisdiction has a governmental interest
that would be impaired by the application of the other state's
law.  In enacting a one-year statute of frauds provision, New
York has manifested an interest in protecting its residents from
having to contest the terms of alleged oral agreements of longer
than one year.  <u>See</u> <u>Anderson v. Tyson</u>, No. 94-0528, 1994 WL
630207, at *2 (E.D. Pa. Nov. 4, 1994).  The purpose of the New

17

resolved the first two steps of the choice-of-law inquiry, and the parties do not contest that resolution.  The Court also made a preliminary determination regarding the third step in the inquiry, concluding that Pennsylvania law applies.  But the Court permitted the parties to raise the choice-of-law issue again on summary judgment "if new facts emerge in discovery which would invite the Court to reevaluate each state's relevant contacts."  Order of March 14, 2012, at 6 n.2.  Tannenbaum argues that such facts have emerged, and so the Court must revisit the third step in the choice-of-law analysis.

> 2. Choice of Law and Summary Judgment

Those facts, however, are the subject of substantial disagreement by the parties.  In particular, the parties disagree as to where the alleged agreement was negotiated and formed, where performance would occur, and where the parties primarily reside.  The Court is therefore faced with a preliminary question regarding how to handle factual disputes

---

York rule is to protect the party against whom an oral contract is sought to be enforced; in this case, Tannenbaum.  As to Pennsylvania's policies, while this Court along with other courts is "wary of divining legislative intent from legislative silence," "a fair inference here is that Pennsylvania's silence reflects a belief that the Commonwealth's interest in enforcing oral contracts exceeds its interest in preventing fraud and perjury." Gallagher, No. 04-236, 2004 WL 2223312, at *5. Assuming that interest, the Pennsylvania rule seeks to protect the party attempting to enforce the oral contract, which here is Toll, a resident of Pennsylvania.  As such, Pennsylvania's interest would be impaired if New York law were to apply.

that underpin the choice-of-law determination when deciding a
motion for summary judgment. Although it is well-established
that determination of the applicable law is a legal question
"whose resolution is entrusted exclusively to the court," that
determination is "frequently premised upon a consideration of
the facts attending the individual case." DuSesoi v. United
Refining Co., 540 F. Supp. 1260, 1268 (W.D. Pa. 1982); see also
Warriner v. Stanton, 475 F.3d 497, 500 (3d Cir. 2007)
(describing the governmental interest analysis as "fact-
intensive"); Gen. Ceramics Inc. v. Firemen's Fund Ins. Co., 66
F.3d 647, 651 (3d Cir. 1995) (explaining that a district court's
choice-of-law determination "involves the application of legal
principles and therefore is subject to plenary review"). When,
as here, those facts are disputed, the Court must decide whether
to view the relevant facts in the light most favorable to the
non-moving party and reserve any genuine disputes for the jury,
or whether the Court can make the factual findings necessary to
resolve the choice-of-law question.

Although the Third Circuit has not yet addressed this
particular question, other circuits have held that the entire
choice-of-law inquiry – including underlying factual disputes –
can properly be resolved by the court on a motion for summary
judgment. See Nautilus Ins. Co. v. Reuter, 537 F.3d 733, 742
(7th Cir. 2008) ("[W]e are of the opinion that the district

19

court must ... resolve factual disputes that bear on the choice-of-law determination."); <u>Vaz Borralho v. Keydril Co.</u>, 696 F.2d 379, 386 (5th Cir. 1983) (upholding the judicial resolution of "factual issues raised in connection with a choice of law determination"), <u>overruled on other grounds by</u> <u>In re Air Crash Disaster Near New Orleans, La on July 9, 1982</u>, 821 F.2d 1147 (5th Cir. 1987).  Those courts reasoned that presenting the choice-of-law factual issues to a jury would be impractical and confusing.  As the Fifth Circuit explained:

> While under the old hard and fast choice of law rules the jury was probably as capable as the court of resolving the issue, adoption of the modern significant relationship test makes jury determination of all of the factors bearing upon choice of law impossible and its resolution of factual issues upon which some factors hinge a cumbersome, delay-ridden, and potentially confusing and time-wasting process.

<u>Vaz Borralho</u>, 696 F.2d at 386 (quoting <u>Chance v. E.I. Dupont Nemours & Co.</u>, 57 F.R.D. 165, 170-71 (E.D.N.Y. 1972)).  It would also "make little sense to let a jury decide which facts are true and then say that there was never a dispute to begin with." <u>Nautilus</u>, 537 F.3d at 743 (quoting <u>Gramercy Mills, Inc. v. Wolens</u>, 63 F.3d 569, 571 (7th Cir. 1995)).  Therefore, as the constitutional right to a jury trial does not "mandate a jury determination of every issue of fact," those courts and others have held that the court should determine the facts necessary to

the resolution of the choice-of-law inquiry.  Chance, 57 F.R.D. at 169; see, e.g., Harper v. LG Elec. USA, Inc., 595 F. Supp. 2d 486, 490 (D.N.J. 2009) (resolving the fact-intensive choice-of-law analysis at the summary judgment stage); Muhl v. Tiber Holding Corp., 18 F. Supp. 2d 514, 523 (E.D. Pa. 1998) (ordering the parties to supplement the factual record so that the court could resolve the factual issues necessary to the choice-of-law determination); Amoit v. Ames, 693 A.2d 675, 679 (Vt. 1997) ("[T]he facts underlying a choice-of-law decision are generally better left to the judge rather than the jury.").

The Court finds that analysis persuasive, and accordingly it will find any disputed facts underlying the choice-of-law decision now, at the summary judgment stage.[6]  The Court is aided in that task by the documents, depositions, and other evidence collected during discovery, as well as the live testimony and additional exhibits submitted during the choice-of-law evidentiary hearing.  See Nunez v. Hunter Fan Co., 920 F. Supp. 716, 718 (S.D. Tex. 1996) ("[T]he facts on which choice-of-law depends are properly determined by the Court after

---

[6]      Of course, once the applicable law is determined, the Rule 56 standard still applies, and the Court will grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, the Court will only find those facts necessary to the choice-of-law determination, not those that may be relevant to the ultimate resolution of this matter.

considering the affidavits, depositions, and other matters
submitted by the parties."); DuSesoi, 540 F. Supp. at 1268
("[W]hen the factual record is adequately developed, summary
judgment determination of the applicable law is entirely
appropriate.").  As it does when resolving contested
jurisdictional facts, the Court can resolve disputes of choice-
of-law facts using the preponderance of the evidence standard.
See Frederico v. Home Depot, 507 F.3d 188, 194 (3d Cir. 2007)
(citing McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178,
189 (1936)); see also Coltec Indus. Inc. v. Zurich Ins. Co., No.
99-1087, 2004 WL 413304, at *4 (N.D. Ill. Jan. 30, 2004) ("The
court, not the jury, is responsible for making any factual
determinations necessary to resolve the choice-of-law inquiry
based on a preponderance of evidence standard.")

   3. Contacts/Interests Analysis

   As discussed above, the Restatement considers five
contacts particularly relevant to the choice-of-law
determination in a breach of contract case: (1) place of
contracting; (2) place of negotiation; (3) place of performance;
(4) location of the subject matter of the contract; and (5) the
domicil, residence, nationality, place of incorporation, and
place of business of the parties.  Restatement (Second) of
Conflict of Laws § 188(2).  Consideration of those factors
"requires more than a mere counting of contacts.  Instead, [the

court] must weigh the contacts on a qualitative scale according to the policies and interests underlying the particular issue." Pacific Employers, 693 F.3d at 436-37 (citation and internal quotation marks omitted).  The importance of each factor depends on the facts of the particular case, and individual factors generally have diminished significance when they are divided among two or more states.  See Restatement (Second) of Conflict of Laws § 188 cmt. e. (explaining that place of negotiation "is of less importance when there is no one single place of negotiation and agreement," and that "place of performance can bear little weight" when performance "is to be divided more or less equally among two or more states").  Overall, the court's task is to identify the "focal point" of the parties' agreement. DuSesoi, 540 F. Supp. at 1270.

Here, however, an examination of the relevant contacts reveals that there is no such focal point to this agreement or concentration of contacts in a particular state.  With regard to the place of negotiation, Toll stated in his deposition that the agreement was discussed "over a long period of time," both on the phone and in person, while he was in several different locations, including the Virgin Islands, Palm Beach, Florida, and Montgomery County, Pennsylvania.[7]  Pl. Toll Dep. 98:11-18;

_____

[7]       That testimony differed from the allegations in the Complaint, upon which the Court based its earlier conclusion

23

see also Pl.'s Pre-Hr'g Mem. 3, ECF No. 81.  Tannenbaum, on the
other hand, says that the entire negotiation occurred while he
and Toll were together on vacation in Florida in March 2007.
Under Toll's version of events, place of negotiation is diffuse
and so of little importance.  See Restatement (Second) of
Conflict of Laws § 188 cmt. e.  Under Tannenbaum's, it is purely
fortuitous, and thus would also bear little weight.  See id.
(explaining that place of contracting has little significance
"when it is purely fortuitous and bears no relation to the
parties and the contract").  The Court therefore finds that
place of negotiation does not weigh strongly in the direction of
either jurisdiction's law.

        Place of contracting is similarly unhelpful.
Tannenbaum claims that the parties reached agreement during the
Florida vacation of March 2007.  Tr. Hr'g, Oct. 24, 2013, ECF
No. 83, at 60.  Toll says that the final meeting of the minds
did not occur until later, when he accepted Tannenbaum's offer
by phone from his office in Pennsylvania.[8]  Pl.'s Pre-Hr'g Mem.

---

that the place of negotiation was Pennsylvania.  See Order of
March 14, 2012, at 5 n.2.  In the Complaint, Toll described only
"discussions occurring in Montgomery County, Pennsylvania," and
made no reference to discussions or negotiations also occurring
elsewhere.  Am. Compl. ¶¶ 35-36.

[8]      That testimony again differs from the allegations in
the Complaint (Am. Comp. ¶ 36) and from Toll's response to
Tannenbaum's first set of interrogatories, in which Toll states
that "Defendant ultimately made the promise to Plaintiff to

3; Pl. Toll Dep. 98:19-24, 105:19-106:10, 110:14-20.  As Toll
rightly notes, the place of contracting is the place where "'the
last act necessary, under the forum's rules of offer and
acceptance,' created a binding and enforceable agreement."
Powers v. Lycoming Engines, 272 F.R.D. 414, 422 (E.D. Pa. 2011)
(quoting Restatement (Second) of Conflict of Laws § 188 cmt. e).
Under Pennsylvania law, "[w]here a contract is accepted by
telephone, the acceptance is effective and the contract is
created at the place where the acceptor speaks."  Interstate
Carriers Coop. v. Workmen's Comp. Appeal Bd., 443 A.2d 1376,
1377 n.3 (Pa. Commw. Ct. 1982) (citing Linn v. Emp'r Reinsurance
Corp., 139 A.2d 638 (Pa. 1958)).  Therefore, under Toll's
version of events, the place of contracting would be
Pennsylvania.

        But, standing alone, that fact is relatively
insignificant.  See Restatement (Second) of Conflict of Laws §
188 cmt. e ("Standing alone, the place of contracting is a
relatively insignificant contact.").  Only when place of
contracting is "one of several contacts in the state" will it
generally bear heavily on choice of law.  Id.  Toll acknowledges
that negotiations occurred in other locations and that

---

share the profits of Fifth Street Management with Elizabeth Toll
at Plaintiff's home in Montgomery County, Pennsylvania."  Pl.'s
Resp. Def.'s Interrog., April 25, 2012.

Tannenbaum was likely in New York at the time of agreement (Pl. Toll Dep. 111:2-4), and so the Court will place little weight on the happenstance that Toll was in Pennsylvania when he accepted Tannenbaum's offer.

Turning to place of performance, that factor is inconclusive, as the parties' performance occurred in different states.  As Toll explains it, the parties' agreement was that Toll would use his standing in the Philadelphia business community and his relationship with a Pennsylvania branch of Wachovia Bank to secure $15 million in funds for Tannenbaum. Pl.'s Pre-Hr'g Mem. 4.  He did so, and signed the loan guaranty agreement in Montgomery County, Pennsylvania.  Pl.'s Resp., Ex. H, Unconditional Guaranty, May 14, 2007, at 7.  Tannenbaum was then expected to provide half of his profits from Fifth Street Management – a company located in New York at the time of contracting – to Elizabeth Toll, who was then a New York resident.[9]  Tr. Hr'g, Oct. 24, 2013, at 64-65.  In other words,

---

[9]       The Court finds unpersuasive Toll's attempt to minimize the location of Tannenbaum's performance.  Toll notes that Tannenbaum waived the "incentive fee" for the first year of Fund III's existence.  Pl.'s Pre-Hr'g Mem. 5.  Because of that waiver, Toll contends that Tannenbaum would not receive any profits from Fifth Street Management for at least a year after the parties reached agreement, and thus that the place where Tannenbaum would eventually perform was "uncertain" at the time of contracting.  Id. at 7.  Toll further notes that Tannenbaum, and Fifth Street Management eventually moved away from New York, as did Elizabeth Toll.  Id. at 5, 7; see also Kaplan Decl., Ex. 10, Separation Agreement; Tr. Hr'g, Oct. 24, 2013, at 64-65.

Toll performed his end of the deal in Pennsylvania, and
Tannenbaum's performance was intended to occur in New York.
Under the circumstances, the Court finds this factor to be
neutral, as performance was "to be divided more or less equally"
between two states.[10]   Restatement (Second) of Conflict of Laws §
188 cmt. e.  For the same reason, the location of the subject
matter of the contract is also evenly divided between both
Pennsylvania and New York.

    Finally, the parties' residences also point in
multiple directions.  At the time of contracting, Toll was a
citizen of Florida with residences in Florida, Pennsylvania, and

---

But none of those assertions change the fact that, at the time
the parties allegedly reached agreement, it appeared that
Tannenbaum's performance would occur in New York, where he and
his wife lived and where his management company was located.
Moreover, Toll's factual assertion that Tannenbaum earned no
profit from Fifth Street Management for the first year is
tenuous; although Tannenbaum temporarily waived the "incentive
fee," he did not waive the "management fee," which included a
"profit component."  Pl.'s Resp., Ex. D, Berman Dep. 207:2.
Tannenbaum's performance obligations therefore may very well
have begun immediately, while Fifth Street Management was still
located in New York.

[10]     At the motion to dismiss stage, the Court concluded
that place of performance favors New York because "defendant was
obligated to provide profits from Fifth Street Management, a
company with its offices located in New York at the time of
contracting."  Order of March 14, 2012, at 5 n.2.  Since then,
Toll has presented additional evidence of his performance, which
seems to have largely occurred in Pennsylvania.  In particular,
Toll testified at the choice-of-law evidentiary hearing that he
used his stance in the Philadelphia business community to help
secure the loans from a Pennsylvania bank, in addition to
signing the loan guaranty agreement in Pennsylvania.

New York.  According to his calendar for 2007, which documents where he slept each night, he spent 93 days in Florida, 90 days in Pennsylvania, 45 days in New York, and 137 days in other locations.  Kaplan Decl., Ex. 12, 2007 Calendar.  Tannenbaum, on the other hand, was a New York resident in 2007.  Thus, to the extent the parties' residences point in a particular direction, they point weakly in favor of New York, as both parties had a connection to that state.[11]  See DuSesoi, 540 F. Supp. at 1270 (concluding that, because the residences of the parties were "fairly evenly divided," that factor "casts little light on the question of applicable law").

In sum, analysis of the relevant contacts does not reveal a particular nexus or focal point to the parties' alleged agreement.  Rather, the facts show that Toll and Tannenbaum lived in different states, reached agreement by phone after negotiations that occurred in multiple locations, and anticipated that performance would happen in both New York and Pennsylvania.[12]  Thus, no clear answer to the choice-of-law question emerges from the parties' connections to each state.

---

[11]     The Court found that factor to be neutral at the motion to dismiss stage, when Toll's calendar was not yet in evidence.  See Order of March 14, 2012, at 5 n.2.

[12]     That is so even when viewing the facts in the light most favorable to Toll, which, as discussed above, the Court need not do when making a choice-of-law determination.  By Toll's own account of events, negotiations occurred in many

        The Court must therefore consider the states' relative
interests and policies, as well as the other general principles
governing choice of law, to determine which state's law to
apply.  As discussed above, Pennsylvania and New York have
conflicting policies regarding the treatment of oral contracts,
and each state has an interest in having its policy enforced.
As the Court explained at the motion to dismiss stage, New
York's limitation on oral contracts lasting longer than one year
"seeks to prevent fraud and perjury against its residents."
Order of March 14, 2012, at 5 n.2.  Pennsylvania's silence
regarding such contracts, on the other hand, "reflects a belief
that the Commonwealth's interest in enforcing oral contracts
exceeds its interest in preventing fraud and perjury."  Inoff,
No. 06-3675, 2007 WL 4355385, at *5.  Those two competing
interests parallel two competing policies that underlie contract
law generally: the overall policy of protecting parties'
expectations through the enforcement of contracts, and the
policy favoring written instruments.  Compare Restatement
(Second) of Conflict of Laws § 188 cmt. b. ("Parties entering a
contract will expect at the very least, subject to rare
exceptions, that the provisions of the contract will be binding

---

locations and few in-person conversations happened in
Pennsylvania.  See Tr. Hr'g, Oct. 24, 2013, at 109-11
(describing the negotiations and ultimate agreement).

29

upon them.") with Gallagher, No. 04-236, 2004 WL 2223312, at *8
(observing that contract law "favor[s] written instruments").

         At the motion to dismiss stage, the Court found New
York's interest in preventing fraud against its residents to be
diminished in this instance because Tannenbaum "specifically
reached into Pennsylvania to negotiate and complete the alleged
contract."  Order of March 14, 2012, at 5 n.2.  That conclusion
was premised on the allegation in the Complaint, viewed in the
light most favorable to Toll, that, "[i]n discussions occurring
in Montgomery County, Pennsylvania, there was a meeting of the
minds between Toll and Tannenbaum as to the terms of their
agreement."  Am. Compl. ¶ 36.  But the facts that emerged in
discovery paint a more complicated picture.  Toll now claims
that negotiations occurred in a variety of locations, that
perhaps only one of the discussions occurred in person in
Montgomery County, and that the final meeting of the minds
happened by phone.  Pl.'s Pre-Hr'g Mem. 3.  Under those
circumstances, Tannenbaum cannot be said to have actively
procured an oral contract in Pennsylvania, such that New York's
interest in the dispute must be accorded less weight.

         In fact, it now seems that the concerns motivating New
York's limitation on oral contracts of indefinite duration are
substantially implicated in this case.  As the Gallagher court
explained:

                                30

> Memorializing agreements not only prevents
> fraud and perjury but also thwarts courtroom
> mistakes that would otherwise occur simply
> because of the fallibility of human memory
> or the unavailability of witnesses.
> Furthermore, reducing agreements to writing
> ensures that parties will act cautiously and
> with deliberation.  Finally, use of the
> written word compels parties to identify in
> one document all material terms and
> conditions, thereby forestalling future
> disputes and, as this case exemplifies,
> future litigation.

Gallagher, No. 04-236, 2004 WL 2223312, at *8.  Here, Toll

claims to have had an oral agreement with Tannenbaum worth

millions of dollars, yet neither party told anyone of the

agreement, much less memorialized it in writing.  The alleged

agreement was formed more than six years ago, and Toll admits to

not recalling many of the details surrounding it.  See, e.g.,

Def. Toll Dep. 99:3-10.  Moreover, both parties are

sophisticated businesspeople who know how to formalize

agreements, and who have done so many times in the past.  Put

simply, this is a case in which sophisticated parties with a

history of doing business together allegedly entered into a

long-term and valuable oral agreement to which there are no

witnesses and little evidence.  In such a situation, the policy

interests animating New York's statute of frauds are, if

anything, heightened.

     Applying New York law here would also protect the

parties' justified expectations in a different respect – it is

consistent with their prior dealings.  In the loan guaranty

agreement for $50 million, which the parties orally entered into

at around the same time as the contested guaranty and eventually

reduced to writing, Toll and Tannenbaum included a choice-of-law

provision selecting New York law to govern their agreement.

Kaplan Decl., Ex. 2, Guaranty Fee Agreement, Oct. 10, 2007.

That the parties chose New York law when they did formalize

their contracts suggests that they could reasonably and

justifiably expect New York law to apply to other agreements as

well.[13]

Finally, applying New York law would further the

"certainty, predictability and uniformity of result" in

interstate cases such as this one.  See Restatement (Second) of

Conflict of Laws § 6(2)(f).  Most states' statutes of frauds

include a provision like New York's, barring oral contracts that

cannot be fully performed within one year. 72 Am. Jur. 2d

Statute of Frauds § 10.  Pennsylvania is in a small minority of

---

[13]      As Toll rightly notes, the two promissory notes
include choice-of-law provisions indicating that Pennsylvania
law should govern those agreements.  See Pl.'s Resp., Ex. F,
Promissory Note, at 5; id., Ex. G, Promissory Note, at 5.  Those
choice-of-law provisions have no direct bearing on this dispute,
as it is the parties' agreement to guaranty the loans in
exchange for payments to Elizabeth – not the actual loan
agreements – that is at issue.  Furthermore, the promissory
notes are standard contracts drafted by Wachovia Bank, and they
therefore provide no indication as to which state's law the
parties expected would govern their own personal agreements.

states that do not do so.  9 Williston on Contracts § 24:1 (4th ed.) n.1 (identifying North Carolina and Pennsylvania as two states that do not include the one-year provision in their statutes of frauds).  Furthermore, Florida – another state with some interest in the dispute – takes the majority approach, and has a statute of frauds that bars oral contracts that are not to be performed within one year.  Fla. Stat. § 725.01 (2013).  Applying New York law would therefore uphold Florida's policy interest and would encourage uniformity of result in similar interstate cases.

For all of those reasons, the Court concludes that New York law applies to Toll's breach of contract claim.

4. Application of New York Law

Under New York law, "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing," if such agreement "[b]y its terms is not to be performed within one year from the making thereof."  N.Y. Gen. Obl. Law § 5-701(a)(1).  Toll admits that his alleged agreement with Tannenbaum was never memorialized in writing (Am Comp. ¶ 1), and he further acknowledged in his deposition that, under the agreement's terms, Tannenbaum would pay profits to Elizabeth Toll "forever" (Def. Toll Dep. 125:8-14).[14]  The

---

[14]        Toll's deposition testimony was as follows:

agreement therefore could not have been performed within one year of its making, and thus falls squarely within the statutory bar.  As such, to the extent the agreement existed at all, it is void.  Judgment therefore will be entered in favor of Defendant on the breach of contract claim, as there can be no breach where there was no valid agreement.

B. Quasi-Contract Claims

In the alternative to his contract claim, Toll brings three equitable quasi-contract claims: unjust enrichment, quantum meruit, and promissory estoppel.  With regard to each claim, he asks for restitution in the form of payment in "an amount equal to the reasonable value of the interest in Fifth Street Management that Toll would have had if Tannenbaum had not made a promise to share the profits equally with Elizabeth." Am. Compl. ¶¶ 60, 67, 73.  Toll says that the reasonable value of that interest would be 90% of Fifth Street Management's profits since May 14, 2007, as that is the amount to which he would have been entitled had the parties followed past practice

---

Q: Was there a discussion of for how long
[Tannenbaum] would pay?
A: Forever.
Q: Forever.  You specifically discussed
that?
A: Yes.

Def. Toll Dep. 125:8-14.

instead of agreeing that Tannenbaum would pay Elizabeth a share of his profits.

Under New York law,[15] quantum meruit and unjust enrichment claims may be analyzed together as a single quasi-contract claim.  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005). Applying New York law, the Court therefore will address those claims first, and then turn to the promissory estoppel claim.

    1. Quantum Meruit and Unjust Enrichment

---

[15]     The parties seem to presume that the law governing the quasi-contract claims will be the same as the law governing the contract claim.  See Pl.'s Resp. 27 n.12 (explaining New York law on quasi-contract claims to support the proposition that such claims can survive "even if the Court applies New York law to the contract claims"); Def.'s Mem. Supp. Mot. Summ. J. 24 (contending that both the contract and quasi-contract claims "should be dismissed under New York's statute of frauds").  At least in this instance, that conclusion is correct.  The Restatement provides that the contacts relevant to claims for restitution, such as the quasi-contract claims brought by Toll here, are "the place where a relationship between the parties was centered"; the place where the benefit was received; the place where the act conferring the benefit was done; "the domicil, residence, nationality, place of incorporation, and place of business of the parties"; and the place where a physical thing related to the enrichment was situated at the time of the enrichment.  Restatement (Second) of Conflict of Laws § 221.  Here, those contacts implicate the same facts discussed above with regard to breach of contract, namely the places of negotiation, contracting, and performance, as well as the parties' residences.  Therefore, to the extent that there is a conflict between New York and Pennsylvania law in this area, the Court will apply New York law to the quasi-contract claims.

Quantum meruit and unjust enrichment are non-contractual, equitable remedies that "rest[] upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." Strategic Alliance Partners, LLC v. Dress Barn, Inc., 386 F. Supp. 2d 312, 319 (S.D.N.Y. 2005) (quoting Miller v. Schloss, 113 N.E. 337 (N.Y. 1916)).  Although termed "quasi-contract," the remedies are not actually grounded in a contract or promise at all.  Id.  Rather, quasi-contract "is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which ex oequo et bono belongs to another."  Id.  Under New York law, in order to succeed on a quantum meruit claim, "a claimant must establish (1) the performance of the services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Martin H. Bauman Assoc., Inc. v. H&M Int'l Transp., Inc., 567 N.Y.S.2d 404, 408 (N.Y. App. Div. 1991).

Tannenbaum argues that, because the alleged oral agreement is barred by the statute of frauds, Toll's "claims for unjust enrichment and quantum meruit should also be dismissed."

36

Def.'s Mem. Supp. Mot. Summ. J. 34.  That is so, he says,
because New York law "prevents a plaintiff from circumventing
the reach of the statute of frauds by asserting a quasi-contract
claim, such as quantum meruit or unjust enrichment."  Id. at 33
(quoting Huntington Dental & Med. Co. v. Minn. Mining & Mfg.
Co., No. 95-10959, 1998 WL 60954, at *7 (S.D.N.Y. Feb. 13,
1998)).  He further contends that Toll's quasi-contract claims
should be dismissed for the independent reason that they would
result in double recovery.  Specifically, he argues that
Elizabeth Toll could potentially have been able to recover due
to the alleged agreement (either for breach of contract or under
a quasi-contract theory), and thus Toll's independent request
for compensation would amount to double recovery, rather than a
claim in the alternative.  Id. at 36-37.

Tannenbaum's first argument fails, as it is not a
complete statement of the law.  Although "[i]t is true, under
New York law, that a plaintiff may not escape the Statute of
Frauds by simply affixing the label 'quantum meruit' to the very
contract claim that is barred," a plaintiff in such a situation
can seek recovery under a quasi-contract theory for the value of
the work performed.  Grappo v. Alitalia Linee Aeree Italiane,
S.p.A., 56 F.3d 427, 433 (2d Cir. 1995); see also Farash v.
Sykes Datatronics, Inc., 59 N.Y.2d 500, 503 (N.Y. 1983).  This
is precisely the purpose for which a claim in quasi-contract is

recognized.  Indeed, "[i]f a party fails to prove a valid,
enforceable contract, ... the court may nonetheless allow
recovery in quantum meruit for claims arising out of the same
subject matter as that contract in order to prevent unjust
enrichment."  Milton Abeles, Inc. v. Farmers Pride, Inc., 603 F.
Supp. 2d 500, 504 (E.D.N.Y. 2009) (emphasis in original).  That
makes sense, as quasi-contract theory "is not really a contract
at all, but rather [is] a legal obligation imposed" either to
prevent a party's unjust enrichment or restore the plaintiff's
former status, if equitable principles so require.  Martin H.
Bauman Assoc., 567 N.Y.S.2d at 408 (quoting Clark-Fitzpatrick,
Inc. v. Long Island R.R. Co., 516 N.E.2d 190 (N.Y. 1987)).
Plaintiffs are therefore barred from recovering in quasi-
contract if they have an available remedy in contract law, but
can pursue equitable claims when no valid contract exists.[16]
Milton Abeles, 603 F. Supp. 2d at 504.

_____

[16]      The cases Tannenbaum cites in support of his argument
are inapposite, as in each one either a valid agreement existed
governing the subject matter of the plaintiff's claim, or the
plaintiff had not rendered any services of value to the
defendant.  See Morgenweck v. Vision Capital Advisors, LLC, No.
08-2969, 2010 WL 9478990, at *5 (S.D.N.Y. 2010)(dismissing
quasi-contract claims because valid agreement covered the matter
of plaintiff's compensation); Holloway v. King, 361 F. Supp. 2d
351, 361 (S.D.N.Y. 2005), aff'd 161 F. App'x 122 (2d Cir. 2005)
(dismissing unjust enrichment claim where enforcement of oral
contract was barred by statute of frauds but two express
agreements governed same subject matter); Huntington Dental &
Med. Co., 1998 WL 60954, at *6 (dismissing quantum meruit claim
where plaintiff had not rendered any services or conferred any

38

But despite the theoretical availability of equitable relief, Toll cannot recover here on a quantum meruit theory for several reasons.  First, his Complaint does not seek recovery for the value of the services he rendered to Tannenbaum.  See Grappo, 56 F.3d at 433 (explaining that a quantum meruit claim is proper if it seeks compensation for the value the work performed, instead of the benefit of the bargain).  Rather, he asks the Court to order payment of 90% of the profits Tannenbaum has earned from Fifth Street Management, on the theory that he would have contracted for that amount if Tannenbaum had not offered to pay Elizabeth Toll 50% of his profits.  In other words, Toll asks the Court to enforce an alternative benefit to the bargain he allegedly reached with Tannenbaum – something he might have contracted for under different circumstances.[17]  Such a remedy would be inconsistent with equitable principles of unjust enrichment, as it "hinge[s] on the existence of an

benefit to defendant); American-European Art Assocs., Inc. v. Trend Galleries, Inc. 641 N.Y.S.2d 835, 836 (1st Dept. 1996)(dismissing quantum meruit claim where no benefit had been conferred to defendant).

[17]     Toll implies that he had a right to a 90% profit share, stating in the Complaint that one of the benefits Tannenbaum received was Toll's "forbearance of interest in Fifth Street Management."  Am. Comp. ¶¶ 57, 64.  But, absent an agreement to that effect, Toll had no legal right to any share of the profits of Fifth Street Management, and thus he had no interest that he could have forborne in exchange for Tannenbaum's promise to share profits with his daughter.

agreement." Strategic Alliance Partners, 386 F. Supp. 2d at

318. More the point, he does not allege that 90% of the profits

is "the reasonable value of the services" rendered, which is the

appropriate remedy in a quasi-contract case.[18] See Longo v.

Shore & Reich, Ltd., 25 F.3d 94, 97-98 (2d Cir. 1994).

        Second, Toll cannot establish the third element of a

quantum meruit claim – an expectation of compensation. Toll

alleges that he expected Tannenbaum to pay Elizabeth Toll in

exchange for Toll's guaranty of the loans; he does not claim to

have expected to receive financial compensation himself.

Although the intangible benefit Toll might have experienced from

the knowledge that his daughter was receiving compensation could

certainly constitute consideration under contract law, it is not

an "expectation of compensation" sufficient for the court to

impose a duty of payment to Toll upon Tannenbaum. See Tasini v.

AOL, Inc., 851 F. Supp. 2d 734, 741 (S.D.N.Y. 2012) (concluding

that plaintiffs could not succeed on a theory of unjust

_____

[18]         In his response to Tannenbaum's motion for summary
judgment, Toll states the "damages on his equitable claims can
be measured by the 'net economic benefit that Tannenbaum
received as a result of the alleged breach of his oral
promise,'" which is "the interest Tannenbaum would have had to
pay for the Loans from Wachovia in the absence of Toll's $15
million guarantee." Pl.'s Resp. 26 (quoting id., Ex. X, Report
of Gregg A. Jarrell, Ph.D. ¶¶ 28-30, Aug. 16, 2012). While that
relief may be proper, as it goes to the value to the services
rendered, Toll did not allege such damages anywhere in his
Complaint.

enrichment when "the plaintiffs expected only [media] exposure rather than monetary compensation"). In fact, even if the parties' alleged agreement were not void, Toll would not be able to recover compensation for the breach because he did not have an economic interest in Tannenbaum's performance. See Restatement (Second) of Contracts § 307 cmt. b (explaining that, in third party beneficiary contracts, "[t]he promisee cannot recover damages suffered by the beneficiary"); see also Order of March 14, 2012, at 13-14 n.5. He therefore has not established an expectation of compensation sufficient for him to recover in equity.

Finally, apart from the alleged breaking of a promise, there is no apparent inequity here such that "equity and good conscience" require the Court to force Tannenbaum to compensate Toll. See R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 60 (2d Cir. 1997). In general, "[l]iability in restitution derives from the receipt of a benefit whose retention without payment would result in the unjust enrichment of the defendant at the expense of the claimant." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a. (emphasis added); see also Maryland Cas. Co. v. W.R. Grace & Co., 218 F.3d 204, 212 (2d Cir. 2000) ("The controlling inquiry under an equitable analysis is whether one party is unjustly enriched at the expense of another ...."). Yet Toll has incurred no apparent expense in

41

guaranteeing the loans; Tannenbaum never defaulted on the loans, and Toll testified at his deposition that he had no out-of-pocket expenses or lost investment opportunities from agreeing to the guaranty.  Def. Toll Dep. 174:19-175:2, 317:23-318:11.[19] Plainly put, other than attorney's fees, Toll suffered no financial loss in this case.

Furthermore, Toll previously guaranteed a $6.7 million loan to Fund II for no compensation at all.  Therefore, although it is true that Tannenbaum received a benefit from the contested guaranty agreement, it does not seem inherently unfair for him to retain that benefit without payment to Toll.  See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 66 (2d Cir. 1999) ("New York law requires more than the receipt of a benefit to support such a recovery.").  Rather, as Toll essentially concedes, any perceived unfairness is solely because Tannenbaum received a benefit while in breach of their alleged agreement.  See Am. Compl. ¶¶ 57, 64 ("It would be inequitable for Tannenbaum to retain the benefit of Toll's $15 million loan guaranty ... because Tannenbaum breached a binding agreement to share the profits of Fifth Street Management equally with Toll's daughter, Elizabeth.").  But that is not a proper basis for

---

[19]    Toll testified that he had to incur expenses to subsidize his daughter's living expenses, but those expenses arose from the alleged breach, not from Toll's performance.  See Def. Toll Dep. 317:14-22.

recovery in quasi-contract, which "is intended to avoid a party's unjust enrichment," not to provide a mechanism "wherein a plaintiff may enforce a purported agreement which might ultimately be found not to be viable."  Martin H. Bauman Assoc., 567 N.Y.S.2d at 408.  Where, as here, the only inequity is the alleged breach itself – not the enrichment without compensation – quasi-contract remedies are unavailable.

Accordingly, the Court will grant summary judgment to Tannenbaum on Toll's unjust enrichment and quantum meruit claims.

### 2. Promissory Estoppel

Toll also cannot recover on his promissory estoppel claim.  Under both New York and Pennsylvania law, a plaintiff can recover on a promissory estoppel claim when there has been a promise, reliance on the promise, and an injury caused by that reliance that can only be avoided by enforcing the promise.  See Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst., 404 F.3d 167, 172 (2d Cir. 2005) (describing New York law); Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (describing Pennsylvania law).  Toll argues that, because of Tannenbaum's promise, he was induced to "forbear his right to the majority share in Fifth Street Management," and that such inducement constitutes an injury that can "be avoided only by enforcing Tannenbaum's promise and ordering that Tannenbaum must

43

make restitution to Toll in an amount equal to the reasonable value of the interest in Fifth Street Management that Toll would have had" absent the promise.  Am. Compl. ¶¶ 71-73.

There are two fatal flaws in that argument.  First, Toll had no legal right to the majority share in Fifth Street Management.  That contention is based solely on a previous agreement the parties had to that effect with regard to Fund I; Toll never claims that they agreed to such an arrangement in this instance, and so there is no legal basis for his claim to a majority interest in Fifth Street Management.  He therefore has not identified an injury caused by his reliance on Tannenbaum's promise, as giving up a "right" to which he was never entitled does not constitute an injury.

Moreover, even if Toll had suffered such an injury, enforcement of the promise would not avoid that injury.  As Toll repeatedly explains, Tannenbaum allegedly promised to pay a share of his profits to his then-wife Elizabeth, not to Toll himself.  The Court therefore cannot "enforc[e] Tannenbaum's promise" by "ordering that Tannenbaum must make restitution to Toll" (id. ¶ 73), because Tannenbaum never promised to pay Toll anything.  Accordingly, as Toll cannot support a claim of promissory estoppel, the Court will grant summary judgment to Tannenbaum on this claim as well.

C. Fraud Claim

44

Toll's final remaining claim is that Tannenbaum committed fraud by misrepresenting to Toll that he would share half of the profits of Fifth Street Management with Elizabeth Toll.  Id. ¶ 75.  Tannenbaum argues that this claim should be dismissed because it is barred by the statute of limitations, because it is impermissibly duplicative of the contract claim, and because the alleged damages are non-existent.

"A federal court, sitting in diversity, follows the forum's choice of law rules to determine the applicable statute of limitations."  Ross v. Johns-Manville Corp., 766 F.2d 823, 826 (3d Cir. 1985)).  Pennsylvania's law provides that "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim."  42 Pa. Cons. Stat. Ann. § 5521(b).  Therefore, regardless of where the fraud claim accrued, the period of limitations is at most two years, as that is Pennsylvania's statute of limitations for fraud claims.  Id. § 5524(7).

Toll alleges that Tannenbaum made fraudulent misrepresentations to him "from late 2006 to May 2007" (Am. Compl. ¶ 77) – more than four years before he filed the Complaint on October 19, 2011.  The fraud claim is therefore time-barred unless Toll can take advantage of the so-called

45

"discovery rule," which "tolls the accrual of the statute of limitations when a plaintiff is unable, <u>despite the exercise of due diligence</u>, to know of the injury or its cause."  <u>Mest v. Cabot Corp.</u>, 449 F.3d 502, 510 (3d Cir. 2006) (internal quotation marks omitted) (emphasis in original).  The discovery rule is intended to "ameliorate the sometimes-harsh effects of the statute of limitations, and it is often applied in medical malpractice and latent disease cases in which the plaintiff is unable to discover his or her injury until several years after the tort occurred."  <u>Id.</u> (quoting <u>Cathcart v. Keene Indus. Insulation</u>, 471 A.2d 493, 500 (Pa. Super. Ct. 1984)) (internal quotation marks omitted).

The plaintiff bears the burden of demonstrating that the discovery rule applies, and to do so must establish "that he exercised reasonable diligence in determining the existence and cause of his injury."  <u>Id.</u> at 511.  In other words, the question is whether, "through the exercise of diligence," the injury was "knowable to the plaintiff."  <u>Debiec v. Cabot Corp.</u>, 352 F.3d 117, 129 (3d Cir. 2003) (alteration omitted).  Although this question is ordinarily for the jury to decide, it can be determined as a matter of law when "reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause."  <u>Fine v. Checcio</u>, 870 A.2d 850, 858 (Pa. 2005).

At the motion to dismiss stage, the Court concluded that "[i]t is not apparent or clear from the face of the Complaint that Plaintiff knew or should have known of the fraud claim more than two years before filing this Complaint."  Order of March 14, 2012, at 9 n.4.  The Court explained that the "familial relationship between the parties" might "affect the level of vigilance required of Plaintiff to satisfy reasonable diligence."  Id.  Therefore, "based on the Complaint alone, viewed in the light most favorable to the Plaintiff," the Court found "that reasonable minds could differ in finding when Plaintiff knew or should have known through the exercise of reasonable diligence of his injury and its cause."  Id.

Since then, evidence collected during discovery has revealed that Toll made no effort to discover the existence of his injury, and thus he cannot make use of the discovery rule. Viewed in the light most favorable to Toll, the facts show that Toll and Tannenbaum entered into an agreement in March 2007, and that Tannenbaum was almost immediately in breach of that agreement, as he never shared any profits from Fifth Street Management with his then-wife Elizabeth.  Yet Toll "trusted that [Tannenbaum] was going to" perform (Def. Toll Dep. 115:18-19), and so at no point from 2007 until October 19, 2009 (two years before the Complaint was filed) did he ask Tannenbaum or his daughter Elizabeth whether performance was occurring.  He

47

therefore did not learn of his injury until well after it actually arose (and, more importantly for our purposes, within two years of filing the Complaint).

The question, however, is not whether Toll knew of his injury, but whether it was knowable to him through the exercise of reasonable diligence.  See Debiec, 352 F.3d at 129 (explaining that "the 'polestar' of the discovery rule is not the plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise of reasonable diligence, knowable to the plaintiff" (alteration and internal quotation marks omitted)).  Toll does not dispute that, had he asked Tannenbaum or his daughter about the payments from Fifth Street Management, he would have learned of his injury.  He also conceded during his deposition that it would have been wise and reasonable to make such an inquiry.  Def. Toll Dep. 120:14-121:18.  Yet it is uncontested that Toll failed to do so, despite being in regular communication with Tannenbaum throughout the relevant period.  Thus, Toll has essentially conceded that he failed to take reasonable steps to discover his injury.

Furthermore, Toll did inquire about Tannenbaum's performance in other regards, and the information he received should have put him on notice that he needed to protect his interests.  Specifically, Toll and Tannenbaum exchanged emails

48

in November 2008, and again in September 2009, in which
Tannenbaum flatly told Toll that he was "not being compensated"
for guaranteeing the $15 million in loans.  Kaplan Decl., Ex. 8,
Email Exchange, Nov. 5, 2008; id., Ex. 6, Email Exchange, Sept.
17, 2009.  Although those statements do not necessarily imply
that Tannenbaum was also not compensating Elizabeth, at the very
least they should have put a reasonable person in Toll's
position on notice that Tannenbaum might not have been
performing on their agreements as Toll expected.  Cf. Perelman
v. Perelman, No. 13-2521, 2013 WL 5764824, at *6 (3d Cir. Oct.
25, 2013) (affirming the district court's conclusion that,
notwithstanding the familial relationship of the parties, a
reasonable person in the plaintiff's position – that is,
involved in a large financial transaction and with reason to be
concerned about potential fraud – could have discovered the harm
through the exercise of reasonable diligence).

        The undisputed facts therefore show that Tannenbaum's
alleged misrepresentation was readily knowable more than two
years before the filing of the Complaint.  Under Toll's own
rendition of events, he entered into a contract that involved
members of his immediate family, and then never again asked
those family members about the agreement, despite being in
regular communication with one of those family members – his
son-in-law and business partner – about related agreements.  No

49

reasonable juror could find from those facts that Toll exhibited
"those qualities of attention, knowledge, intelligence and
judgment which society requires of its members for the
protection of their own interest and the interest of others."
Fine, 870 A.2d at 858.  Doing "nothing" in this case does not
satisfy the required diligence, which is the hallmark of the
discovery rule.

        Toll's arguments to the contrary are unavailing.  Toll
justifies certain of his failures to inquire about the
agreement, explaining that he never discussed business with his
daughter Elizabeth, and that it would not have been reasonable
to "inject[] himself" into her fragile marital situation in the
fall of 2009 by inquiring about the agreement.  Pl.'s Resp. 32.
But those explanations merely reveal why Toll failed to take
certain actions at certain times – they do nothing to help Toll
meet his burden of demonstrating that his injury was unknowable
even through the exercise of reasonable diligence.

        Toll also implies that, because of the familial
relationship between the parties, the exercise of "reasonable
diligence" does not include inquiring into the status of the
agreement.  Although it is true, as the Court earlier noted,
that the "familial relationship between the parties is ...
relevant to a discovery rule analysis because the nature of the
relationship and the degree of trust between the parties may

                                  50

affect the level of vigilance required of Plaintiff to satisfy reasonable diligence," the Court never suggested that the familial relationship effectively excused that burden entirely. See Order of March 14, 2012, at 9 n.4. As the Third Circuit has explained, "though the relationship [between the parties] may be 'pertinent to the question of when a plaintiff's duty to investigate arose,' the relationship is not dispositive." Perelman, No. 13-2521, 2013 WL 5764824, at *6 (quoting In re Mushroom Transp. Co., 382 F.3d 325, 343 (3d Cir. 2004)). As such, Toll's familial relationship with Tannenbaum is a factor to consider when deciding what level of diligence was reasonable under the circumstances, but it does not forgive Toll's failure to take any steps to protect his own interests.

Therefore, as no reasonable jury could find that Toll's injury could not have been discovered through the exercise of reasonable diligence, the discovery rule is inapplicable to this case. Accordingly, the Court concludes that the statute of limitations bars his fraud claim.

## V.   CONCLUSION

For the foregoing reasons, the Court will grant Tannenbaum's motion for summary judgment in its entirety, and will enter judgment in favor of Defendant and against Plaintiff. An appropriate order follows.